UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

       Plaintiff,

   v.

WESLEY ELVIS PEDEN,

       Defendant.

CASE NO. CR. 06-0300 WBS

MEMORANDUM AND ORDER RE:
MOTION TO SUPPRESS

----oo0oo----

    Defendant Wesley Peden moves to suppress any and all evidence seized when law enforcement officers searched his home and computer on December 17, 2004, as well as all subsequent evidence obtained as a result of that initial search.

I.   Factual and Procedural Background

    On December 17, 2004, Krystine Frederick, a 17 year old minor, telephoned the toll-free crisis line of the Butte County Department of Behavioral Health Homeless Emergency Runaway Effort ("HERE"). (Declaration of Philip Oliver 2:16-18.) Frederick claimed that she and Kristy Lopez, a 14 year old minor, were upset and contemplating suicide because they discovered that a camera hidden in a wall clock in their shared bedroom at

1

1  defendant's residence transmitted an apparent live feed of video
2  images to defendant's personal computer.[1] (Id. 2:18-24.)

3       Frederick stated that while using defendant's computer
4  earlier in the evening she came across the live feed, which she
5  subsequently demonstrated to Lopez. (Id. 3:3-8.)  According to
6  Frederick, Lopez then became angry and disconnected all wires and
7  computer cables connecting the camera in the clock with
8  defendant's computer. (Id. 3:8-12.)  At that point, the live
9  video feed ceased. (Id. 3:12-13.)

10      Frederick indicated to the counselor that she was aware
11 of the camera for several weeks, having discussed it with
12 defendant when he installed it. (Id. 3:23-27.)  She stated that
13 defendant informed her it was for security purposes, as he
14 suspected a thief had been stealing items from the house. (Id.
15 3:1-2.)  The HERE counselor transferred the call to the 9-1-1
16 emergency operator for the Butte County Sheriff's Department, who
17 dispatched Deputy William Brewton to the home at approximately
18 9:53 p.m. (Id. 3:17-22.)

19      Frederick and Lopez answered the door upon Deputy
20 Brewton's arrival--neither defendant nor McClauskey were home.
21 (Opp'n to Mot. to Suppress 3:5-6.)  Frederick told Deputy Brewton
22 that defendant installed a hidden video camera in their bedroom
23 and was monitoring and recording them. (Mot. to Suppress 2:10-
24 14.)  Frederick stated that defendant gave her explicit

26      [1]  Lopez is the daughter of defendant's live-in girlfriend
27 Pamela McClauskey and Frederick is a family friend who was living
   at the house for the preceding eight months. (Oliver Decl. 2:4-
28 5.)  David Lopez, Kristy Lopez's brother, also resided at
   defendant's residence.

2

permission to use his personal computer that night, and while doing so she discovered video clips of herself and Lopez "walking in and out of the bedroom and while Fredrick was asleep," as well as various pornographic images. (Id. 2:10-17.)

Frederick then took Deputy Brewton to defendant's bedroom where his personal computer was set up. (Opp'n to Mot. to Suppress 3:10.) She showed Deputy Brewton the video clips she found earlier in the evening, and tried but failed to demonstrate the live feed from the hidden clock camera. (Id. 3:13-15; Oliver Decl. 3:22-26.) Deputy Brewton also observed a video camera on top of defendant's computer "pointed down the hallway to the female's [sic] room." (Mot. to Suppress 2:19-20.) Frederick then brought Deputy Brewton into her shared bedroom and showed him the camera hidden in the clock. (Id. 3:20-21.) Deputy Brewton observed that the bedroom did not have a door. (Id.)

Deputy Brewton called his supervisor, Sergeant Anthony Borgman, who arrived at approximately 10:23 p.m. (Opp'n to Mot. to Suppress 3:15-17.) Frederick told Sergeant Borgman that she knew about the camera for several weeks. (Mot. to Suppress 2:22-23.) Frederick stated that defendant told her he installed it in order to catch a thief that had been stealing from them and requested she not tell Lopez. (Id.) Deputy Brewton and Sergeant Borgman then spent some time in defendant's bedroom examining his computer outside the presence of Frederick and Lopez. (Oliver Decl. 4:1-3.)

Shortly thereafter, defendant returned home. (Opp'n to Mot. to Suppress 3:18.) In response to the officers' questions, defendant confirmed that 1) he gave Frederick and Lopez

3

permission to use his computer, 2) he set up the cameras in an effort to catch a thief, and 3) he watched on his computer when Frederick and Lopez were naked and changing clothes. (Mot. to Suppress 3:1-9; Opp'n to Mot. to Suppress 3:18-4:17.) Sergeant Borgman asked defendant whether he had any child pornography on his computer, at which point defendant admitted that he downloaded child pornography while researching a paper on the subject. (Id.) Sergeant Borgman asked defendant if he could take the computer for a forensic examination and defendant agreed. (Mot. to Suppress 3:10-11.) Sergeant Borgman took possession of the computer and cameras, and Child Protective Services ("CPS") took the girls from the home for the duration of the investigation. (Id. 3:12-15.)

On January 6, 2005, Investigator Richard Barton of the Butte County District Attorney's Office requested and received a search warrant for defendant's and Lopez's computer (both in a police evidence locker at the time) as well as defendant's home. (Mot. to Suppress 3:18-4:3.) The affidavit for the search warrant indicated that the deputies responded to a call regarding a welfare check and that the events that followed (described above) constituted probable cause for a search. (Id.)

When police searched defendant's computer on January 6, 2005, they found more than 1,000 images of child pornography. (Opp'n to Mot. to Suppress 4:20-22.) On January 11, 2005, the police searched defendant's home and seized several items, including a computer, camera equipment, CDs, and VHS tapes. (Mot. to Suppress 4:4-9.) Two of the CDs contained additional pornographic images. (Id.)

4

1    On May 26, 2005, defendant shipped a CD to the Federal
2 Bureau of Investigation ("FBI") Civil Rights Squad in Sacramento,
3 which contained numerous images of child pornography.  (Opp'n to
4 Mot. to Suppress 4:23-25.)  FBI Special Agent Davidson later
5 conducted an interview with defendant, during which defendant
6 explained that he collected the pornographic images in an attempt
7 to identify Butte County children who were being exploited.  (Id.
8 4:9-11.)  On May 5, 2006, the FBI executed a search warrant on
9 defendant's home, seizing computer equipment, CDs, external
10 drives, and other equipment.  (Mot. to Suppress 4:12-13.)

11    On July 20, 2006, the United States Attorney filed an
12 indictment charging defendant with violations of 18 U.S.C. §
13 2252(a)(2), receipt of visual depictions of minors engaged in
14 sexually explicit conduct, and 18 U.S.C. § 2252(a)(4)(B),
15 possession of one or more matters containing depictions of minors
16 engaged in sexually explicit conduct.  (July 20, 2006
17 Indictment.)  Defendant now asks this court to suppress all
18 evidence obtained during the December 17, 2004 search, and "all
19 fruits thereof."  (Mot. to Suppress 14:7-9.)

20 II.  Discussion

21    A.  Warrant Requirement

22    Because the Fourth Amendment to the United States
23 Constitution protects "people, not places," Katz v. United
24 States, 389 U.S. 347 (1967), a defendant moving to suppress items
25 seized in a search must first demonstrate that he personally had
26 a "legitimate expectation of privacy" in the place searched or
27 the thing seized.  Rakas v. Illinois, 439 U.S. 128, 143 (1978);
28 United States v. Davis, 332 F.3d 1163, 1167 (9th Cir. 2003).  "A

5

person has an expectation of privacy in his or her private, closed containers." <u>Davis</u>, 332 F.3d at 1167 (citing <u>United States v. Fultz</u>, 146 F.3d 1102, 1105 (9th Cir. 1998)). Undoubtedly, this extends to personal computers in one's home, and thus the government concedes in this case that defendant had a legitimate expectation of privacy in his computer seized on December 17, 2004.[2]  (Opp'n to Mot. to Suppress 6:13-18.)

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure.  As a general rule, therefore, "entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." <u>Steagald v. United States</u>, 451 U.S. 204, 211 (1981).  Evidence that is seized in violation of a defendant's Fourth Amendment rights is inadmissable in court and must be excluded. <u>Mapp v. Ohio</u>, 367 U.S. 643, 654-55 (1961).  In this case, it is undisputed that the officers entered the home on December 17, 2004, and subsequently seized the computers and other equipment without securing a warrant.

B.   <u>Exceptions to the Warrant Requirement</u>

There are, however, various exceptions to the general warrant requirement.  First, there are two "exceptions to the warrant requirement for home searches" based on the urgency of the situation: "exigency and emergency." <u>United States v. Martinez</u>, 406 F.3d 1160, 1164 (9th Cir. 2005).  In addition, consent to enter and search will also abrogate the warrant requirement. <u>Steagald</u>, 451 U.S. at 211.

---

[2]   With respect to the CD mailed to the FBI in May, 2005, the government makes no such concession.

1                    1.    <u>Exigency/Emergency</u>

2    _____Under the exigency doctrine, a warrantless search of a

3    home "is permitted if there is probable cause to believe that

4    contraband or evidence of a crime will be found at the premises

5    and that exigent circumstances exist." <u>Martinez</u>, 406 F.3d at

6    1164.  The Ninth Circuit has defined "exigent circumstances" as

7    those which "would cause a reasonable person to believe that

8    entry . . . was necessary to prevent physical harm to the

9    officers or other persons, the destruction of relevant evidence,

10   the escape of the suspect, or some other consequence improperly

11   frustrating legitimate law enforcement efforts." <u>Id.</u> (citing

12   <u>United States v. McConney</u>, 728 F.2d 1195, 1199 (9th Cir. 1984)

13   (en banc) (abrogated on other grounds)).  There must be a

14   "substantial risk [that] would arise if the police were to delay

15   a search until a warrant could be obtained." <u>United States v.</u>

16   <u>Reid</u>, 226 F.3d 1020, 1027-28 (9th Cir. 2000) (quoting <u>United</u>

17   <u>States v. Gooch</u>, 6 F.3d 673, 679 (9th Cir. 1993)).

18           Similarly, the emergency doctrine provides that "if a

19   police officer, while investigating within the scope necessary to

20   respond to an emergency, discovers evidence of illegal activity,

21   that evidence is admissible even if there was not probable cause

22   to believe that such evidence would have been found." <u>Martinez</u>,

23   406 F.3d at 1164 (quoting <u>United States v. Cervantes</u>, 219 F.3d

24   882, 888 (9th Cir. 2000)).  This exception thus has three

25   requirements: "(1) The police must have reasonable grounds to

26   believe that there is an emergency at hand and an immediate need

27   for their assistance for the protection of life or property. (2)

28   The search must not be primarily motivated by intent to arrest

and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." Id. (quoting People v. Mitchell, 39 N.Y.2d 173, 177-78 (N.Y. 1976)).

    2.   Consent

    Third party consent may justify a warrantless search if the third party "possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). Common authority may be either actual or apparent. Davis, 332 F.3d at 1169.

    A party has actual authority to consent to a search if either "the owner . . . has expressly authorized the third party to give consent or if the third party has mutual use . . . and joint access or control . . . ." Id. (quoting United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir. 1998)).  Neither party asserts that the defendant authorized Frederick or Lopez to consent to a search of his home or computer, thus the question is whether they had sufficient "joint access or control."  The Supreme Court repeatedly has held that such third-party consent is determined by "mutual use of the property by persons generally having joint access or control for most purposes . . ." over the quarters or objects to be searched. Matlock, 415 U.S. at 171 n.7. (emphasis added); Illinois v. Rodriquez, 497 U.S. 177, 177 (1990).

    A third party has apparent authority if (1) the officer determined the third-party's ability to consent based on an untrue fact, (2) the officer's belief was objectively reasonable,

1  and (3) the third party would have had authority if the fact had
2  been true.  <u>United States v. Ruiz</u>, 428 F.3d 877, 880 (9th Cir.
3  2005) (citing <u>United States v. Dearing</u>, 9 F.3d 1428, 1429-30 (9th
4  Cir. 1993)).  Importantly, a mistaken belief that the search was
5  proper given the uncontested facts is not a mistake of <u>fact</u>, but
6  a mistake of <u>law</u>.  The apparent authority doctrine applies "only
7  to reasonable mistakes of fact, not to mistakes of law."  <u>Ruiz</u>,
8  428 F.3d at 880 (citing <u>Welch</u>, 4 F.3d at 764-65).

9       Defendant argues first that the police officers had no
10  right to enter and remain in the house, and second that even if
11  they did, they had no right to search defendant's bedroom and
12  computer.

13       C.   <u>Entry into Defendant's Home</u>

14            1.   <u>Exigency/Emergency</u>

15       The court is not persuaded that either the exigency or
16  emergency exceptions to the warrant requirement justify the
17  officers' remaining in defendant's home.  Significantly, both of
18  those exceptions require some amount urgency, and the government
19  has failed to show that any such circumstances existed in this
20  case.  <u>See</u> <u>United States v. Sangineto-Miranda</u>, 859 F.2d 1501,
21  1511 (6th Cir. 1988) ("Before exigent circumstances are present .
22  . . the police must have a reasonable basis for believing there
23  is someone in the house who would likely destroy the evidence.")
24  (citing <u>Vale v. Louisiana</u>, 399 U.S. 30, 34-35 (1970)).  Because
25  the officers quickly determined that the girls were no danger to
26  themselves, any exigent circumstances ceased to exist soon after
27  their arrival.  (Opp'n to Mot. to Suppress Exs. 1, 3.)

28

2.   <u>Consent</u>

Defendant argues that the girls lacked the authority to allow the officers inside the house in the first instance subsequent to their 9-1-1 call.  (Mot. to Suppress 6:17-22.) Specifically, defendant argues that Frederick and Lopez are precluded from consenting to any entry solely by virtue of being minors.  (Mot. to Suppress 9-11.)  Defendant's assertion, however, is not supported by existing law.  The only three circuits to address this issue have all upheld searches conducted pursuant to third-party consent by a minor.  See <u>United States v. Clutter</u>, 914 F.2d 775 (6th Cir. 1990); <u>United States v. Gutierrez-Hermosillo</u>, 142 F.3d 1225 (10th Cir. 1998); <u>Lenz v. Winburn</u>, 51 F.3d 1540 (11th Cir. 1995); <u>see also Georgia v. Randolph</u>, 126 S.Ct. 1515, 1522 (2006) (noting that a child of eight might have the ability to consent to a police officer crossing the threshold).

The only authority for this proposition cited by defendant is a decision by the California Supreme Court, which held that an eleven year old lacked the authority to permit the police to enter the defendant's home.  <u>People v. Jacobs</u>, 43 Cal.3d 472 (1987).  However, the <u>Jacobs</u> court noted that their holding did not operate as a <u>per se</u> rule, and that in some cases "as a child advances in age she acquires greater discretion to admit visitors on her own authority."  <u>Id.</u>; <u>see also People v. Hoxter</u>, 75 Cal. App. 4th 406, 412 n.3 (1999) (noting that state courts tend to agree with <u>Jacobs</u>).

The record indicates that Frederick, 17, and Lopez, 14, were both relatively responsible teenagers.  <u>See</u>, <u>generally</u>,

10

<u>Davis v. United States</u>, 327 F.2d 301 (9th Cir. 1964) (noting that, while a minor's age may be a factor in assessing the voluntariness of consent, no special rule applies to consent by a minor).  Moreover, the court in <u>Jacobs</u> noted that some exceptions might allow a minor to consent, such as "searches made at the request of a child or when a child is the victim of or a witness to a crime."  <u>Id.</u> at 483.  In this case, both of those exceptions apply.  The original call that brought the officers to the home mentioned a possible crime[3] of which the girls were both victims, and it was the girls who invited the officers in.  Accordingly, the "consent" exception justifies the officers entering the home to the extent necessary to investigate the girls' claims.

At the hearing on this matter, the government for the first time argued that the condition of defendant's home as observed by the officers upon entry otherwise justified their decision to remain until CPS could come and remove the two girls from the home.  <u>See</u> Cal. Penal Code § 273a (child endangerment statute); <u>People v. Brown</u>, 19 Cal. App. 3d 1013, 1017 (1974) (noting that conditions such as strewn clothing, dirt, debris, animal excretions, and the odor of defecation were all proper factors in assessing whether a child was being endangered).  Given that neither officer made any mention of the conditions of the home in either of their police reports, there was some initial doubt as to the truth of government's assertion in this respect.  (Opp'n to Mot. to Suppress Exs. 1, 3.)  However,

_____

[3]    Specifically, California Penal Code section 647(k) makes it illegal to record the interior of areas with a reasonable expectation of privacy with the intent of invading that privacy.

Exhibit 1 to the government's supplemental opposition provides a collection of color photographs of defendant's home that show unwashed dishes, animal excrement in several places throughout the home, and an extremely unkempt state.  Accordingly, this further justifies the officers remaining at the home.

        D.    Search of Defendant's Bedroom and Computer

            The "consent" exception justifies the officers' entry into the home for the purposes of responding the girls' call, and upon listening to the girls' accounts, the officers were further justified in remaining at the home until they could ensure the girls' welfare would be protected.  However, the question of whether the officers had the right to enter and remain in defendant's home for a period of time must be distinguished from whether they had the right to enter and search defendant's bedroom and computer.  In this respect, the court finds that none of the exceptions to the warrant requirement justify the officers' conduct.

            1.    Exigency/Emergency

            As noted, the exigency exception requires some indication of evidence of a crime, as well as "exigent circumstances."  Martinez, 406 F.3d at 1164.  Although the officers had an indication that defendant was illegally recording the two girls (as well a possible indication that the children were being neglected based on the condition of the home), there were no "exigent circumstances" that required the officers to search Peden's bedroom or his computer.  First, the officers' actions were not necessary to prevent further harm to Frederick and Lopez as a result of defendant's video recording.  The girls

12

were now aware of the camera--indeed, Frederick knew about it for weeks, if not months, and Lopez, upon learning of its existence, disconnected it from defendant's computer.  Moreover, there were many options for keeping the girls safe, short of a warrantless search.  The defendant was not at the scene at the time.  The officer could have instructed the girls to not return to the room, or could placed them in Child Protective Service's custody (as was eventually done).  Simply put, the search of the computer was in <u>no</u> <u>way</u> related to ensuring the girls' safety.

Most importantly, there are no facts that indicate, and indeed the government does not argue, that time was of the essence in collecting the computer and camera or that the officers otherwise thought the evidence would be moved or destroyed.  <u>See</u> <u>United States v. Sangineto-Miranda</u>, 859 F.2d 1501, 1511 (6th Cir. 1988) ("Before exigent circumstances are present . . . the police must have a reasonable basis for believing there is someone in the house who would likely destroy the evidence.") (citing <u>Vale v. Louisiana</u>, 399 U.S. 30, 34-35 (1970)).  In this case, the government incorrectly confuses the admittedly urgent nature of the girls' original phone call with a justification of the subsequent search of defendant's bedroom and computer.  Although defendant's computer was indirectly related to the reason the girls were upset, it had nothing to do with any impending danger or harm.  The proper course of action was to acquire a proper warrant before proceeding as they did.

With respect to the emergency exception, the court need look no further than the first requirement to see that this exception also does not apply.  <u>Martinez</u>, 406 F.3d at 1164

1  (noting first that there must be "an emergency at hand and an

2  immediate need for [the officers'] assistance for the protection

3  of life or property").  As discussed in the previous section,

4  there are no indications from the police officers' reports that

5  an emergency existed that threatened life or property.  Absent

6  such urgency, the officers' search of defendant's home and

7  computer was not necessary.  Cases applying this exception

8  involve situations where time is of the essence, for example

9  where officers are unsure if there is a victim, suspect, or

10  injured person inside the house.  See, e.g., Martinez, 406 F.3d

11  at 1164 (domestic violence call where, upon arrival, officers

12  observed woman outside crying and heard man inside screaming).

13  There was no indication that time was of the essence in this

14  case.  When police "have ample opportunity to obtain a warrant,

15  we do not look kindly on their failure to do so."  United States

16  v. Impink, 728 F.2d 1228, 1231 (9th Cir. 1984).  This exception

17  to the warrant requirement is inapplicable.  Accordingly, the

18  officers' search of defendant's bedroom and computer were

19  improper and in violation of defendant's Fourth Amendment rights.

20          2.  Consent

21  _____  The Ninth Circuit has placed significant restrictions

22  on the ability of a third party to consent to a search of

23  another's property.  See United States v. Fultz, 146 F.3d 1102

24  (9th Cir. 1998) (homeowner lacked authority to consent to search

25  of houseguests boxes); United States v. Welch, 4 F.3d 761 (9th

26  Cir. 1993) (car renter lacked authority to consent to search of

27  co-renter's purse); United States v. Davis, 332 F.3d 1163 (9th

28  Cir. 2003) (resident lacked authority to consent to search of co-

14

1    inhabitant's gym bag).  Importantly, just because the two girls
2    lived in the house and could consent to the officers' entry does
3    not mean they may consent to a search of any room or anything
4    therein.  See Randolph, 126 S.Ct. at 1522 ("[W]hen it comes to
5    searching through bureau drawers, there will be instances in
6    which even a person clearly belonging on premises as an occupant
7    may lack any perceived authority to consent; 'a child of eight
8    might well be considered to have the power to consent to the
9    police crossing the threshold into that part of the house where
10   any caller, such as a pollster or salesman, might well be
11   admitted,' but no one would reasonably expect such a child to be
12   in a position to authorize anyone to rummage through his parents'
13   bedroom.") (citation omitted).

14          The government must demonstrate that Frederick and
15   Lopez had "joint access or control for most purposes" over
16   defendant's bedroom and computer, a burden that has not been met.
17   See United States v. Impink, 728 F.2d 1228, 1232 (9th Cir. 1984)
18   ("The government always bears the burden of proof to establish
19   the existence of effective consent.").  The government asserts
20   that by allowing Frederick to use the computer, defendant assumed
21   the risk that she would consent to such a search.  (Opp'n to Mot.
22   to Suppress 9:3-8.)  However, mere access to an area or object is
23   not sufficient--it is entirely likely that a "party may not
24   generally have 'joint access . . . for most purposes'; his right
25   of access may be narrowly prescribed."  Impink, 728 F.2d at 1233
26   (quoting Matlock, 415 U.S. at 171 n.7.).  In this case, in
27   contrast to the main living room, there can be no doubt that
28   defendant has "the greater right of 'access or control for most

                                    15

purposes'" over his own bedroom and personal computer.  <u>Id.</u>

Defendant did grant Frederick specific permission to use his computer to check her email on December 17, 2004.  (Opp'n to Mot. to Suppress Ex. 3; Oliver Decl. 3:3-4.)  However, the fact that Frederick needed to seek defendant's permission to enter his bedroom and use his computer is strong evidence that they had <u>unequal</u> access and control.  <u>See</u> <u>Davis</u>, 332 F.3d at 1169 n.4 ("[N]othing in the record here indicates that Smith had mutual use of and joint access to or control over Davis' bag, the bed under which it was stored, or even the bedroom in which it was discovered.").  Defendant granted Frederick and Lopez permission to enter his bedroom and use his computer for a limited purpose and a limited period of time.

In her testimony at the hearing, Frederick confirmed that she called defendant on December 17, 2004, to seek permission to use his computer, but that the permission did <u>not</u> include the right to access to his personal files.  Such limited access is insufficient to rise to the level of "joint access or control for most purposes."  Minor children are not co-equal inhabitants of a home owned by a parent, nor are they co-owners of all possessions contained therein.  A finding to the contrary would run counter to the very nature of the parent-child relationship, and the inherent authority that a parent has over a minor child.[4]  Accordingly, the girls did not have actual

---

[4]    This would also seem consistent with California law regarding a minor's ability to consent.  While a minor is not <u>per se</u> excluded from giving consent, California places numerous and substantial restrictions on a minor's ability to do so.  <u>See</u>, <u>e.g.</u>, Cal. Fam. Code § 302 (minor may not consent to marriage without parental consent or court order); Cal. Penal Code § 261.5

authority to consent to the search.

Moreover, with respect to "apparent authority," the officers were not operating under any mistaken facts.  They were aware that the two girls were minors who lived in defendant's house.  (Opp'n to Mot. to Suppress 3:1-5.)  Moreover, they were aware that the computer resided in defendant's bedroom, that it belonged to him, and that he granted the girls limited permission to use it that evening while he was gone.  (Id. 3:9-10.)  The government does not point to any mistaken facts which caused the officers to believe they were justified in their actions.  Accordingly, the girls also did not have apparent authority to consent the search.

E.   Fruit of the Poisonous Tree

Although the court finds that the officers' search of defendant's bedroom and computer was improper, the inquiry does not end there.  The court must determine what evidence, if any, must be excluded as a result of the officers' conduct.  Evidence that is directly derived from an illegal entry and search must be excluded.  Wong Sun v. United States, 371 U.S. 471 (1963).

---

(minor may not consent to sexual intercourse); Cal. Fam. Code §§ 6910, 6911, 6922 (minor may not consent to most medical/dental treatments without parental consent); Cal. Health & Safety Code § 123930 (same); Cal. Penal Code §§ 652, 653 (minor may not get a piercing or permanent tattoo without parental consent); Cal. Veh. Code §§ 17700, 17701 (minor may not acquire driver's license without parental consent); Cal. Bus. & Prof. Code § 22706(b)(3) (minor may not utilize tanning facility without parental consent); Cal. Educ. Code § 48200 (minor must attend compulsory education); Cal. Civ. Code § 1556 (minor may not enter into binding contract).  It would seem quite anomalous, given these substantial limitations on the rights of minors to consent, that a minor would nonetheless be permitted to consent to an encroachment of third-party's fundamental constitutional right such as the right to be free from unreasonable search and seizure.

Additionally, "[c]onsent . . . is tainted where the evidence indicates that it stemmed from the prior illegal Government action." United States v. Oaxaca, 233 F.3d 1154, 1158 (9th Cir. 2000); United States v. Suarez, 902 F.2d 1466, 1468 (9th Cir. 1990). However, evidence can be cured of its taint if the connection between the improper government action and the attainment of the evidence is sufficiently attenuated. United States v. George, 883 F.2d 1407, 1415-1417 (9th Cir. 1989). Specifically, the court must consider whether defendant's actions were "sufficiently an act of free will to purge the primary taint of the unlawful invasion." United States v. Perez-Esparza, 609 F.2d 1284, 1289 (9th Cir. 1980) (quoting Wong Sun, 371 U.S. at 486).

### 1.   Defendant's Statements to the Officers

With respect to defendant's statements to the officers (i.e. that he videotaped the girls and that his computer contained child pornography), defendant argues that these statements were not "voluntary" and thus may not be used against him.  Fruits of involuntary confessions cannot be used against a defendant in a criminal trial. Crane v. Kentucky, 476 U.S. 683, 687-88 (1986).  In determining whether a statement is voluntary, the totality of the circumstances must be considered, including "both the characteristics of the accused and the details of the interrogation." United States v. Kelley, 953 F.2d 562, 564 (9th Cir. 1992) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  Courts have considered factors such as the age of the accused, lack of education or intelligence, length of detention, repeated and prolonged nature of the questioning, and punishment

1  such as deprivation of food or sleep.  Schneckloth, 412 U.S. at

2  226.

3       In this case, nothing occurred over the hour-long

4  period of time in which the officers questioned defendant that

5  indicates his will was overborne.  The defendant is an adult who

6  seemed reasonably alert, intelligent, and aware of what was going

7  on around him.  (Supp. Reply Ex. A ("videotape").)  He engaged

8  the officers at the scene throughout the entire encounter, at

9  times even making small talk and laughing.  (Id.)  At no time was

10  he ever physically restrained, threatened with violence or

11  punishment, or denied the right to enter his home.  (Id.)

12       Defendant argues that the officers were restraining

13  him, citing both the fact that the questioning occurred outside

14  of the home and that at a particular point he began to shiver

15  from the cold because the officers would not permit him to go

16  inside.  The videotape of the incident, however, shows no

17  restraint.  The officers originally approached and questioned

18  defendant outside the home, but as soon as it became clear that

19  defendant was cold and feeling ill, the officers allowed him to

20  enter the home.[5]  Moreover, despite the fact that defendant began

21  shivering, there is no indication that his ability to think or

22  reason was in any way impaired.  See Kelley, 953 F.2d at 564-66

23  (finding that a defendant suffering from "chills, shakes, sweats,

24  and trembling hands" as a result of heroin withdrawal could still

25  make a voluntary statement as long as his "ability to think

26  rationally was unimpaired" and "no coercive police activity

27

28       [5]  Importantly, all of the incriminating statements that
defendant seeks to suppress had already been made by this point.

19

1  occurred.").

2       Defendant also asserts that the officers' failure to

3  read him his <u>Miranda</u> rights mandates the exclusion of all of his

4  statements.  Police officers are required to give an individual

5  <u>Miranda</u> warnings prior to interrogation when a suspect is in

6  "custody."  <u>United States v. Butler</u>, 249 F.3d 1094, 1098 (9th

7  Cir. 2001).  The determination of whether an individual is in

8  custody turns on whether a "reasonable innocent person in such

9  circumstances would conclude that after brief questioning he or

10 she would not be free to leave."  <u>United States v. Booth</u>, 669

11 F.2d 1231, 1235 (9th Cir. 1981.)

12      There are no indications of coercion or force by the

13 officers in this case, nor is there any evidence that defendant

14 was not free to leave at any time.  Indeed, the officers

15 eventually left that evening without arresting defendant.  The

16 defendant was interviewed at his home, and at no time did the

17 interview ever become angry, combative, or confrontational.  <u>See</u>

18 <u>United States v. Eide</u>, 875 F.2d 1429, 1437 (9th Cir. 1989)

19 (noting that <u>Miranda</u> warnings were not required "particularly

20 because the FBI agents interviewed [defendant] at his home, and

21 also because the meeting was amicable").  Accordingly,

22 defendant's statements were voluntary and will not be excluded.

23      2.   <u>Defendant's Computer and Home</u>

24      Subsequent to defendant's statements to the officers,

25 they asked him if they could take his computer with them for

26

27

28

20

examination, and defendant consented.[6]  On January 6, 2005, the

Butte County District Attorney's office secured a warrant to

search the computer.  For the same reasons discussed above, the

court finds that defendant's consent to the officers taking the

computer was voluntary.  However, the inquiry does not end there,

for the court must determine whether the officers' improper

search of defendant's computer on December 17, 2004, tainted the

affidavit, and thus the warrant, upon which the January 6, 2005

search of defendant's computer and the January 11, 2005 search of

defendant's home was based.

The Supreme Court held that a defendant may challenge

the veracity of a search warrant.  <u>Franks v. Delaware</u>, 438 U.S.

154, 164 (1978).  However, the "mere inclusion of tainted

evidence in an affidavit does not, by itself, taint the warrant

or the evidence seized pursuant to the warrant."  <u>U.S. v. Vasey</u>,

834 F.2d 782, 788 (9th Cir. 1987) (citing <u>United States v.</u>

<u>Driver</u>, 776 F.2d 807 (9th Cir. 1985)).  Instead, the court must

"excise the tainted evidence and determine whether the remaining,

untainted evidence would provide a neutral magistrate with

probable cause to issue a warrant."  <u>Id.</u>.

In this case, the three page affidavit attached to the

January 6, 2005 warrant contains only one sentence at the bottom

of page one, as well as a single, six-line paragraph at the top

of page two, that describe how the girls took the officers into

---

[6]     Defendant asserts that the video evidence instead shows
that the officers <u>told</u> defendant the computer was coming with
them, as opposed to <u>asked</u>.  While the video does contain such an
interaction, the officers testified at the hearing that they
first asked defendant's permission earlier in the evening, prior
to when the videotape began recording.

1  defendant's bedroom and showed them defendant's computer. (Opp'n

2  to Mot. to Suppress Ex. 4.) The affidavit does not even contain

3  any mention of what the officers saw on defendant's computer,

4  merely that they observed the computer in the room as well as the

5  video camera that was placed on top of the computer monitor.

6  (Id.)

7        The rest of the affidavit recounts in detail the events

8  of that evening, including the original 9-1-1 call leading to the

9  welfare check of the two minors, and the fact that, upon

10 arriving, the two girls told Deputy Brewton that they discovered

11 defendant was secretly videotaping them. (Id.) The girls also

12 told Deputy Brewton that the camera was connected to defendant's

13 computer. (Id.) The affidavit goes on to describe how the girls

14 told Deputy Brewton that defendant took several digital

15 photographs of them facing the camera with their legs spread.

16 (Id.) Furthermore, the affidavit recounts how the girls told the

17 officers that they used defendant's computer earlier in the night

18 and that they found video clips of themselves taken without their

19 knowledge. (Id.) Finally, the affidavit describes the various

20 statements made by defendant after he arrived home, admitting

21 that 1) he downloaded images of child pornography, some of which

22 were still on his computer, and 2) that he placed the concealed

23 camera in the girls bedroom to catch a thief, but that he had

24 watched videos of the girls while they changed their clothes.

25 (Id.)[7] All of this evidence together is more than enough for a

26

27        [7]   As discussed in the previous section, these statements
28 are not tainted by involuntariness and thus may constitute
   additional grounds for a finding of probable cause.

22

1 | neutral magistrate to find that probable cause existed to search
2 | defendant's computer.  Accordingly, the warrant is not invalid,
3 | and any evidence discovered during the January 6, 2005 search of
4 | defendant's computer and the January 11, 2005 search of
5 | defendant's home pursuant to that warrant will not be excluded.

6 |          3.  <u>CD Sent to the FBI</u>

7 |           With respect to the CD that defendant sent to the FBI,
8 | as well as subsequent statements made to FBI Special Agents, the
9 | connection between these actions and the December 17, 2004 search
10 | is extremely attenuated.  First, over five months passed between
11 | the two incidents.  Moreover, the defendant was not under arrest
12 | and had every opportunity to consult with an attorney before
13 | mailing the CD.  The FBI was not even involved in the December
14 | 17, 2004 incident.  When defendant sent the CD, he was not in the
15 | presence of, or under any implicit pressure from, police officers
16 | or federal agents.  He packaged up and mailed the CD of his own
17 | volition and his intentional abandonment of that property
18 | sufficiently purged any taint that may have existed.  <u>Abel v.</u>
19 | <u>United States</u>, 362 U.S. 217, 241 (1960).  Accordingly, this
20 | evidence not be excluded, nor will any evidence collected in
21 | the May 5, 2006 search conducted by the FBI pursuant to a
22 | warrant.

23 |         IT IS THEREFORE ORDERED that defendant's motion to
24 | suppress be, and the same hereby is, DENIED.
25 | DATED:  August 9, 2007

26 |
27 | WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE
28 |

23